UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,        )
                  Plaintiff,     )
          v.                     )   Civil Action No.
                                 )
1426-1428 HYDE PARK AVENUE, HYDE )
PARK, MASSACHUSETTS, d/b/a "Manning MAGISTRATE JUDGE
Café Inc." and/or "Billy Jack's  )
Restaurant"; $159,992.43 IN U.S. )
CURRENCY; and $210,000 IN        )
U.S. CURRENCY,                   )
                  Defendants.    )

05 10458 WGY

**VERIFIED COMPLAINT FOR FORFEITURE IN REM**

The United States of America, by its attorney, Michael J.
Sullivan, United States Attorney for the District of
Massachusetts, in a civil action of forfeiture pursuant to Title
18, United States Code, Section 1955(d), alleges that:

1.    This Court has jurisdiction in this matter pursuant to
28 U.S.C. §§ 1345, 1355, and 1356.  Venue is appropriate pursuant
to 28 U.S.C. § 1395.

2.    The Defendant Properties consist of the following: (a)
the real property and buildings located at 1426 - 1428 Hyde Park
Avenue, Hyde Park, Massachusetts, doing business as Manning Café,
Inc., and/or Billy Jack's Restaurant ("Billy Jack's"), consisting
of two adjacent buildings, and all other things of value
associated with that business; (b) $159,992.43 in U.S. currency,
seized by Agents of the Federal Bureau of Investigation on or
about March 29, 2000; and (c) $210,000.00 in U.S. currency,
representing proceeds from the sale of the real property located

at 238 Central Avenue, Humarock, Marshfield/Scituate,
Massachusetts (collectively referred to as the "Defendant
Properties").

3.    The in rem Defendant Properties are now, and, during
the pendency of this action, will be within the jurisdiction of
this Court.

## FACTUAL BACKGROUND

4.    As outlined in the Affidavit of Special Agent Philip M.
Sliney, Jr., of the Federal Bureau of Investigation, which is
attached to this Complaint as Exhibit A and incorporated by
reference, beginning in approximately 1993 and continuing until
March 2000, John J. Manning, III ("Manning") was engaged in an
illegal gambling business in violation of 18 U.S.C. § 1955.  The
business was conducted from various locations, including Manning
Café, Inc., d/b/a Billy Jack's, located at 1426 - 1428 Hyde Park
Avenue, Hyde Park, Massachusetts.

5.    It is unlawful to conduct, finance, manage, supervise,
direct, or own all or part of an illegal gambling business.  18
U.S.C. § 1955(a).  An "illegal gambling business" means a
gambling business which (i) is a violation of the law of a State
or political subdivision in which it is conducted; (ii) involves
five or more persons who conduct, finance, manage, supervise,
direct, or own all or part of such business; and (iii) has been
or remains in substantially continuous operation for a period in

2

excess of thirty days or has a gross revenue of $2,000 in any single day.  18 U.S.C. § 1955(b).

6.    Manning conducted, financed, managed, supervised, directed, and owned all or part of an illegal gambling business, conducted in violation of the laws of the Commonwealth of Massachusetts in which such business was conducted, to wit: Massachusetts General Laws, Chapter 271, §§ 16A, 17, 17A, 20, and 22.

7.    On February 7, 2003, Manning was charged by the United States Attorney for the District of Massachusetts by Information with violations of 18 U.S.C. § 1955 (Illegal Gambling), among other charges.  (See Criminal No. 03-10031-WGY).  Manning entered a plea of guilty on May 16, 2003, to the illegal gambling count, as well as Conspiracy and Filing False Income Tax Return charges.

## COUNT ONE

8.    Any property, real or personal, used in violation of the provisions of 18 U.S.C. § 1955(a) is subject to seizure and forfeiture to the United States.  18 U.S.C. § 1955(d).  The defendant real property, Manning Café, Inc., d/b/a Billy Jack's Restaurant, located at 1426 - 1426 Hyde Park Avenue, Hyde Park, Massachusetts, was used in violation of 18 U.S.C. § 1955(a).  The defendant real property is, therefore, subject to seizure and forfeiture to the United States of America, pursuant to 18 U.S.C. § 1955(d).

3

## COUNT TWO

9.    Any property, real or personal, which constitutes, or
is derived from, proceeds traceable to a violation of section
1955, or a conspiracy to commit such offense, is subject to
seizure and forfeiture to the United States pursuant to 18 U.S.C.
§ 981(a)(1)(A).   The defendant lots of currency, $159,992.43 and
$210,000, constitute proceeds of violations of 18 U.S.C.
§ 1955(a), and are, therefore, subject to seizure and forfeiture
to the United States of America pursuant to § 981(a)(1)(A).

WHEREFORE, the United States of America prays:

1.    That a warrant and monition, in the form submitted
herewith, be issued to the United States Marshal for the District
of Massachusetts commanding him to give notice to all interested
parties to appear and show cause why the forfeiture should not be
decreed;

2.    That judgment of forfeiture be decreed against the
Defendant Properties;

3.    That thereafter, the Defendant Properties be disposed
of according to law; and

4

4.    For costs and all other relief to which the United States may be entitled.

Respectfully submitted,
MICHAEL J. SULLIVAN
United States Attorney

By: _Shelbey D. Wright_
SHELBEY D. WRIGHT
Assistant U.S. Attorney
1 Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3100

Dated:  3|10|05

## VERIFICATION

I, Philip M. Sliney, Jr., Special Agent, Federal Bureau of Investigation, state that I have read the foregoing Verified Complaint for Forfeiture In Rem, and that the contents thereof are true to the best of my knowledge, information and belief.

_Philip M. Sliney, Jr._
Philip M. Sliney, Jr.,
Special Agent
Federal Bureau of Investigation

Dated: March  7 , 2005

5

COMMONWEALTH OF MASSACHUSETTS

Suffolk, ss.                                              Boston

Then personally appeared before me the above-named Philip M. Sliney, Jr., Special Agent, Federal Bureau of Investigation, who acknowledged the foregoing to be true to the best of his knowledge, information and belief, on behalf of the United States of America.

Subscribed to and sworn to before me this _____7ᵗʰ_____ day of March   , 2005

_Lisa J. Talbot_
Notary Public
My commission expires: 5/29/09

LISA J. TALBOT
Notary Public
Commonwealth of Massachusetts
My Commission Expires
May 29, 2009

6

### Exhibit A

## AFFIDAVIT OF SPECIAL AGENT PHILIP M. SLINEY, JR.

I, Philip M. Sliney, Jr., Special Agent of the Federal
Bureau of Investigation, United States Department of Justice,
being duly sworn, depose and state as follows:

### Introduction

1.     I am a Special Agent with the Federal Bureau of
Investigation ("FBI"), United States Department of Justice, and
have been so employed for approximately 13 years.  I am currently
assigned to the FBI's Boston Field Division.  Since December
2004, I have been assigned to the Public Corruption/Government
Fraud Squad.  In this capacity, my duties and responsibilities
include conducting criminal investigations of individuals and
businesses who have violated federal criminal laws, with an
emphasis on the fraudulent conduct of public officials and
government contractors.  Prior to this time, I worked in the
White Collar Crime Division of the New York Office of the FBI on
various squads that investigated bank fraud, money laundering,
securities fraud, and corporate fraud.

2.     I graduated from the FBI Academy in Quantico, Virginia,
in April 1995, where I received training in the area of financial
investigations, among other disciplines.  I also received
instruction on probable cause as it relates to search and seizure
warrants, and methods and practices of executing them.  I have

-1-

received additional training in the area of asset forfeiture as well.  In my 10 year tenure as an FBI Special Agent, I have participated in a wide variety of successful White Collar Crime investigations where asset forfeiture played a role.

3.    With respect to this affidavit, I have participated in a joint investigation being conducted by the FBI, the Drug Enforcement Administration ("DEA"), the Massachusetts State Police ("MSP"), the Boston Police Department ("BPD"), the Internal Revenue Service ("IRS"), and the U.S. Department of Labor involving the recent criminal activities of John J. Manning, III ("Manning"), and others.

4.    As a result of my personal participation in this investigation, and based upon my familiarity with reports made to me by other Special Agents of the FBI, as well as other law enforcement agents and officers, cooperating witnesses, confidential informants, and other concerned parties involved in this investigation, and my review of confidential communications made to other FBI Agents and law enforcement officers by individuals either associated with, or having knowledge pertaining to, the activities of Manning, and others, I am familiar with the facts and circumstances of the offenses described in this affidavit.

5.    I submit this affidavit in support of a Complaint for Forfeiture In Rem against the following properties:

-2-

a.   the real property and buildings located at 1426 - 1428 Hyde Park Avenue, Hyde Park, Massachusetts, doing business as Manning Café, Inc., and/or Billy Jack's Restaurant ("Billy Jack's"), consisting of two adjacent buildings, and all other things of value associated with that business;

b.   $159,992.43 in U.S. currency seized by Agents of the Federal Bureau of Investigation on or about March 29, 2000; and

c.   $210,000.00 in U.S. currency, representing proceeds from the sale of the real property located at 238 Central Avenue, Humarock, Marshfield/Scituate, Massachusetts,

(collectively referred to as the "Defendant Properties").

6.   As detailed in this affidavit, there is probable cause to believe that the Defendant Properties constitute (a) property involved in a violation of 18 U.S.C. § 1955(a) and/or (b) property derived from proceeds traceable to a violation of section 1955, or a conspiracy to such offense. I, therefore, have probable cause to believe that the Defendant Properties are subject to seizure and forfeiture to the United States pursuant to 18 U.S.C. § 981 and § 1955(d).

**Background of Case**

7.   Beginning on August 11, 1993, and continuing until December 21, 1993, the Honorable Robert E. Keeton, United States District Judge, District of Massachusetts, authorized court-ordered electronic surveillance which revealed that Manning was operating a large-scale illegal gambling enterprise under the protection of John "Jack" Salemme, a "made" member of the La Casa

-3-

Nostra ("LCN"), and the brother of then Boss Francis P. Salemme, Sr. Subsequent investigation indicated that Manning supervised more than fifty betting agents and met with them on a regular basis every Wednesday to settle-up their gaming debts at a bar known as Billy Jack's, located in Hyde Park, Massachusetts. This electronic surveillance intercepted numerous conversations concerning a large scale gambling operation controlled and operated by John Salemme. Manning was among the individuals participating in the gambling operation who were intercepted talking with John Salemme. Manning was intercepted a total of six times during this electronic surveillance, specifically on August 23, 1993, August 25, 1993, September 28, 1993, September 29, 1993, October 29, 1993, and December 19, 1993. The investigation also revealed that Manning was in frequent daily telephone contact with a number of "offices" believed to be accepting the bets on behalf of the Manning enterprise. The investigation also revealed that Manning's illegal gambling enterprise also engaged in money laundering, and the extortionate extensions of credit and collections of credit by extortionate means, and that it operated under the protection of John Salemme. This electronic surveillance intercepted numerous conversations concerning a large scale gambling operation controlled and operated by John Salemme.

-4-

## Description of an Illegal Gambling Business

8.    As a result of my law enforcement experience, I have become familiar with the operation of illegal gambling businesses and the methods used by persons engaged in the operation of such businesses.

9.    I know that most illegal gambling operations in the Greater Boston area accept bets and wagers on several types of activities, including sporting events.  The taking of bets on sporting events is prohibited in Massachusetts.

10.   I know from my background, training, and experience that few, if any, bookmakers are able to operate independently over a period of time.  The more common pattern is to be a part of, or to become associated with, a larger operation in order to lay off bets and wagers, and to exchange other gambling information such as odds, point spreads, etc., necessary to operate successfully.  This association allows the individual bookmaker to handle bets in larger amounts and to balance his bets so as to avoid catastrophic losses.

11.   An illegal gambling operation, like legitimate business organizations, has a certain hierarchical structure which, while not rigid, places the persons working within it in a certain position relative to the overall operation.  The largest number of persons working in all illegal gambling business are agents or writers.  A writer or agent is an individual who accepts bets and

-5-

wagers from the general population.  The writer or agent
generally receives a commission based upon a percentage of the
bets turned into the office.  He can either receive a set
percentage of all monies that he brings into the operation
without being responsible for any of the pay offs on winning bets
that he places with the office, or he may receive a larger
percentage of the monies that he brings in if he agrees to bear a
greater risk by assuming responsibility for a percentage of the
monies lost on bets that he has placed with the office.  By his
association with an office, he is protected from catastrophic
loss on any bet.

        12.   In the field of sporting events, it is necessary for
every writer or agent to have what is known as a "line" on any
sporting event on which he is accepting wagers.  This line
includes point spreads, odds, and money lines.  Bets in the field
of sports are generally received the day of, or the day before
the sporting event, but can and will be accepted as much as five
days before the event.  The line on any given sporting event
should be common to all agents of a given operation but may vary
slightly between one office and another.  These lines are
extremely important to the operation of any illegal sports
bookmaking operation, as they can mean the difference between a
profit and a loss on any given event.  Different offices will
compare lines to determine any variance so that they may lay-off

-6-

bets at the most advantageous odds.  The line on any given
sporting event may change and fluctuate during the betting period
on the sporting event depending on numerous variables including
amounts of money bet on the contestants in that event, physical
or emotional factors of the contestants which may affect the
outcome of the event, and the location of the event.  Each office
maintains a record of the line on each sporting event on which
that office is accepting bets.  This record includes the original
line and the changes, if any, that have occurred in that line.

    13.  Another method commonly used by bookmakers for
accepting sports bets involves the distribution of a "football
card."  A football card contains the listing of weekly college
and professional football games.  This listing discloses the
line, or the point spread between the favored team and its
opponent.  A person who wishes to bet a football card can
typically pick from 4 to 10 teams, college or professional,
favorite or underdog.  Each team is numbered consecutively.  For
example, for 35 games listed on a typical card, the team would be
numbered from 1 to 70, each number representing a team.  At the
bottom of the card on a detachable "receipt" is a listing of
these numbers. A better circles the number corresponding to the
team he believes will beat the point spread.  The point spread is
listed on the card.  A bettor usually has to pick from a minimum
of 4 teams to a maximum of 10 teams.  In case of a tie involving

-7-

the point spread, the bettor loses. On the detachable "receipt" the bettor uses some type of identification (code name or number), circles the number of the team he has chosen, and writes the amount of money he is wagering. The "receipt" is given to someone in the football card operation (usually a runner). The bettor usually keeps the top half of the card as his record of what teams he selected. Both portions of the card have identical "serial" numbers for identification of winning tickets. Winners usually receive their winnings on Tuesday or Wednesday following completion of the weekend football games.

## The Investigation

14.    This investigation has utilized several undercover officers ("UC") and confidential sources of information ("CS"). (This Affidavit does not include all information obtained by each and every UC and CS.)  UC#1 is a Massachusetts State Police Trooper who spent approximately 18 months investigating the targets in an undercover capacity. CS#1 is a former employee and customer at Billy Jack's, and operated for approximately four months. UC#2 is a law enforcement officer who is a customer at Billy Jack's. In his position as a customer, UC#2 has been able to make certain observations relevant to this investigation.

15.    According to CS#1, during his employment at Billy Jack's, CS#1 learned, through personal observations and discussions with various individuals, including Manning, William

-8-

Mouradian Sr. ("Mouradian, Sr."), and William Mouradian Jr.
("Mouradian, Jr."), that Manning operated a large illegal sports
betting and football card betting organization. CS#1 stated that
during the early 1980's, CS#1 observed Jack Salemme meet Manning
at Billy Jack's weekly to deliver several thousand football
betting cards. CS#1 observed that, during the period between
approximately the early 1990's and 1998, Manning's brother Robert
Manning would routinely deliver football betting cards to Billy
Jack's on Mondays at approximately 4:00 p.m. He would carry them
in a paper bag and leave them in the kitchen in a cabinet. CS#1
learned that Robert Manning worked as a Constable for the City of
Boston. This is confirmed by numerous checks made out to Robert
Manning on the account of Blaustein and Witten, Constables, City
of Boston, which were deposited into the Billy Jack's bank
account. Kevin McCarthy ("McCarthy"), who worked at Billy Jack's
for over fifteen years, would take the football cards from the
kitchen and place them behind the bar. McCarthy and the other
bartenders would then distribute the football cards to the
patrons of Billy Jack's.

16. CS#1 personally observed that, as part of the Manning
sports betting operation, Manning regularly met his associates,
or "agents," at Billy Jack's on Wednesdays beginning in the late
morning. Manning sat at a table with what appeared to be a
ledger book. One by one, the agents would sit at the table with

-9-

Manning to discuss their bookmaking activity. CS#1 observed these individuals hand Manning envelopes which CS#1 was able to observe often contained money and/or football card stubs. CS#1 is unfamiliar with the names of the agents, except for Michael Griffin ("Griffin") and Vincent DiSangro.

17. Additionally, when CS#1 was an employee at Billy Jack's, CS#1 routinely observed Manning bringing a cigar box of cash to Billy Jack's every Wednesday, Thursday, and Friday, which the bartenders used to cash patrons' paychecks. CS#1 did not believe that the cash came from the bar. The bartenders placed the customers' checks in the cigar box. CS#1 was advised by Manning that this practice stopped for a period of time because of concerns about a "money laundering" investigation. (Manning was interviewed by FBI agents on December 8, 1993, concerning his handling of large amounts of cash related to Billy Jack's.)

18. An IRS Agent assigned to this investigation reviewed the bank records for Billy Jack's, which were maintained under the Manning Café, Inc., account at the Fleet Bank for the years 1997 and 1998. The review indicated that there were total deposits of approximately $474,000.00 into the account in 1997, only $3,000.00 of which were cash deposits. The remainder of the deposits consisted of checks, the majority of which were payroll and personal checks of apparent patrons of Billy Jack's. Similarly, approximately $545,000.00 was deposited into the

-10-

account in 1998, only approximately $31,000.00 of which was cash
deposits. The remainder consisted of payroll and personal checks
of apparent patrons of Billy Jack's. I believe that Manning
attempted to conceal the source of his illegal gambling proceeds
by using those proceeds, in part, to fund the cigar box which is
used to cash checks presented by customers of Billy Jack's and by
depositing those checks into the Billy Jack's bank account.

19. When CS#1 worked at Billy Jack's, people would
sometimes give him envelopes to give to Manning. CS#1 placed
these envelopes in a drop safe in the floor behind the bar at
Billy Jack's. CS#1 believed that only Manning had the
combination to this safe during the time CS#1 worked there.
While CS#1 worked at Billy Jack's, he frequently observed Manning
remove numerous envelopes from this safe every week.

20. Over the years, CS#1 had discussions with McCarthy,
Griffin, James Gillis ("Gillis"), Mouradian, Sr., Mouradian, Jr.,
and others, during which they revealed that they were illegal
sports betting agents who worked under Manning.

21. On or about September 5, 1997, CS#1 observed McCarthy,
who was situated behind the bar at the rear of Billy Jack's,
taking money and football cards from patrons and placing them in
a cigar box located behind the bar. CS#1 also observed McCarthy
take out envelopes and hand them to some patrons. CS#1 observed
that these envelopes contained money. CS#1 stated that the box

-11-

had black lettering on it.

22.   A second confidential source of information, CS#2, has
stated that, during 1995 and 1996, he operated as a bookmaking
agent for Manning.  CS#2 registered his bets through an "office"
operated by "Rocky" Massara (phonetic).  Based on the information
set forth below, I believe that the person is actually Peter
Massaro, whose vehicle had been observed at 238 Central Street,
Humarock, Massachusetts, a house owned by Manning.  Each Monday,
CS#2 would telephonically contact "Rocky", who would apprize CS#2
of his current account balance.  "Rocky" would advise CS#2 if he
was "up" or "down", up meaning he was owed money by Manning,
consisting of his commission on the monies collected by the
Manning enterprise on losing wagers by the customers, or down
meaning he needed to obtain money from the Manning enterprise to
pay off the winnings of his customers for that week.  On
Wednesday, CS#2 would meet Manning at Billy Jack's and either
provide an envelope to Manning with the appropriate amount of
cash, if, for example, his customer's wagers (after payouts for
winning bets and deduction of CS#2's commission) had generated a
surplus of money for the Manning enterprise for that week, or
receive from Manning an envelope with the appropriate amount of
cash required to pay off winning bets (if the total bets
collected for the week were not sufficient to cover the winning
payoffs).  In other words, Manning operated as a "bank" and

-12-

maintained a sufficient surplus of cash to cover the losses of the various agents working for the Manning enterprise from week to week. CS#2 also noted that he would typically deduct his commission from the amount of any winnings handed over to Manning. CS#2 knows from personal observations that other bookmaking agents followed the same procedure. If CS#2 disagreed with the figures provided by "Rocky," he would bring his records to the Wednesday meeting to reconcile his figures with Manning's. CS#2 never met "Rocky," to the best of his knowledge.

23. CS#2 reported that at the time that he worked for Manning's organization, "Rocky" was the manager of Manning's primary booking office. Although he does not recall the telephone numbers at which he contacted "Rocky", CS#2 does recall that the location of the office was said to be on the water in Marshfield, Massachusetts.

24. On January 3, 1997, UC#2 presented a football card to the bartender at Billy Jack's, Al Jeannetti ("Jeannetti"). The card had been previously purchased at Billy Jack's by UC#2. Jeannetti stated that it looked like a winner. He took the card and placed it in his left rear pocket, stating that he would check it out. UC#2 was then told to return within a day or two to collect the winnings. UC#2 then observed Manning open a floor safe located behind the bar at Billy Jack's. Manning used his right hand to remove approximately 20 white letter sized

-13-

envelopes. UC#2 watched as Manning took the envelopes to the end of the bar furthest from the front door. Manning opened one envelope which appeared to contain cash. The envelopes had writing on the front but UC#2 was unable to distinguish what they said. Manning then went to a back room of Billy Jack's. UC#2 then observed Jeannetti open a black cigar box located behind the bar next to the cash register. The box had a small amount of duct tape on the edge of the cover and on the bottom. It contained cash. Jeannetti took some money out, made change, and put some money back in the box.

25. On or about October 3, 1997, UC#1, accompanied by CS#1, entered Billy Jack's. While there, UC#1 engaged Mouradian, Jr. in a conversation concerning illegal gaming. CS#1 asked Mouradian, Jr. for a "football card", which was provided to UC#1. Mouradian, Jr. then explained to UC#1 how to play the card. Mouradian, Jr. ended by telling UC#1 to separate the bottom stub from the card and to keep the card.

26. On or about October 12, 1997, CS#1 stated that Stephen Jeannetti advised CS#1 that he was a "runner" for Manning, meaning that he picked up and delivered illegal gaming related information and/or cash and that Stephen Jeannetti had been so employed for approximately ten years and did most of this work in the South Shore area.

27. On or about October 19, 1997, UC#1, while inside Billy

-14-

Jack's, observed Manning call Mouradian, Jr. to his side and then hand Mouradian, Jr. a large roll of what appeared to be cash. The outside currency note was a twenty dollar bill. Mouradian, Jr. placed this in his right front pants pocket. Mouradian, Jr. and Manning then engaged in a conversation concerning the "over/under," a betting term referring to a bet placed on a projection of the combined points of two teams, for football games from the prior weekend.

28.   On December 22, 1997, CS#1 had a conversation with Gillis in Billy Jack's. Gillis told CS#1 that he worked for Jack Manning in Manning's gaming operation. Gillis said that he was directly under Manning in the operation. Gillis stated that he employed a number of people taking bets over the telephone and that if any of his people were arrested Manning would pay the $500.00 fine. Gillis said Manning wanted Gillis to go back to work on the telephones personally because they would make more money. Gillis added that if a customer won a lot of money, Gillis would go to Manning to get the money.

29.   On or about March 2, 1999, CS#1 stated that he recently had a conversation with Michael Tracey ("Tracey") at Billy Jack's. Tracey advised that he was running a "gaming office" from the apartment he shared with his girlfriend "Dee" in Braintree. Tracey stated that the office was part of Manning's gaming operation. CS#1 believed that "Dee" may be Deanna M.

-15-

Folino, who frequented Billy Jack's herself.

30.   On or about September 22, 1999, CS#2 observed Manning at the bar in the back room of Billy Jack's.  Manning met with three individuals one by one while sitting at the bar.  Although he did not observe what transpired at the meeting and all three individuals were unknown to CS#2, CS#2 believes the actions were consistent with "settle up" meetings.  On this occasion CS#2 asked Manning how business was.  Manning responded with words to the effect, better than last year.

31.   On or about September 29, 1999, CS#2 again observed Manning at the bar in the back room of Billy Jack's.  Manning met individually with two white males in a manner consistent with the behavior described above.

## Search Warrant Results

32.   On March 29, 2000, search warrants were executed at 1426-1428 Hyde Park Avenue, Boston, Massachusetts, which is Billy Jack's, and 191 Gardiner Road, Quincy, Massachusetts ("Gardiner Road"), which is Manning's home.  Prior to executing the search warrant at Gardiner Road, a surveillance was instituted.  At approximately 9:43 a.m., a white Cadillac with Massachusetts registration Y5N, which belongs to Peter Massaro, was observed in the driveway.  An individual entered the vehicle and departed at approximately 10:22 a.m.  At approximately 10:59 a.m., Manning departed and drove to Billy Jack's, where he arrived at

-16-

approximately 11:03 a.m.  Within an hour, searches were being
conducted at both locations.

33.   At the Gardiner Road location, federal agents seized
approximately $116,000 in cash and a quantity of records
apparently related to a sports betting operation.  Included in
the latter were 42 separate accountant-style spread sheets
containing names and figures.  These were forwarded to the
Racketeering Records Analysis Unit of the FBI's Laboratory
Division.  The examination concluded that the documents were the
records from the managerial level of a bookmaking operation.

34.   Items seized at Billy Jack's included approximately
190.8 grams of a white powder which later tested positive for
cocaine, cash, and what appeared to be gaming records.  The
gaming records included two sheets which, in my opinion, were
records of a bookmaking operation.  One of the sheets has the
figure "-1596" following the name "Fish."  I believe that this
indicates that an agent of Manning's owes $1,596.  Among the
other items seized was an envelope with "Jack (Fish)" on the
front.  This envelope contained $1,600 in cash, which I believe
is the agent's payment to Manning.  In all, approximately $43,992
was seized from Billy Jack's and approximately $116,000 was
seized from Gardiner Road during the March 29, 2000, searches
(totaling the $159,992.43 in United States currency described
above).

-17-

35.  During the search at Billy Jack's, an individual named John J. O'Leary ("O'Leary") arrived at the premises.  He advised that he was there to leave an envelope for Manning containing $8,646, which represented a portion of the proceeds of O'Leary's part of the gaming operation.  O'Leary stated that he had been a booking agent for Manning for approximately four or five years, and reported his activity to Peter Massaro.  He stated that Peter Massaro coordinates gaming information for Manning.  O'Leary would also receive a facsimile report on his position from Manning each week.

## Criminal Prosecution of John J. Manning

36.  On September 17, 2002, Manning entered into a plea agreement in which he agreed to waive indictment and plead guilty to an Information (United States v. John J. Manning, Criminal No. 03-10031-WGY) charging him with one count of conducting, financing, managing, and supervising an illegal gambling business, in violation of 18 U.S.C. 1955; two counts of wilfully making and subscribing to false individual tax returns for himself and his wife, in violation of 26 U.S.C. § 7206; and one count of conspiring to defraud the Internal Revenue Service during the years 1993 through 1999, in violation of 18 U.S.C. § 371.  Manning also admitted that the Defendant Properties constituted proceeds of, or monies and properties used in violation of, and/or in furtherance of, his illegal gambling

-18-

business, and that they are subject to forfeiture in accordance with the provisions of 18 U.S.C. 981 and/or 1955(d).  He further agreed not to contest the civil or administrative forfeiture of the Defendant Properties.  The Information was filed by the United States Attorney for the District of Massachusetts on February 7, 2003.

37.  On May 16, 2003, Manning entered a plea of guilty to the illegal gambling business and tax charges listed in the Information.  As of this date, sentence has not been imposed.

### Conclusion

38.  Based on the facts contained in this Affidavit, there is probable cause to believe that the Defendant Properties constitute (a) property involved in Manning's substantial illegal gambling operation, a violation of 18 U.S.C. § 1955(a), and/or (b) property derived from proceeds traceable to such violations, or a conspiracy to commit such offenses.  The Defendant Properties are, therefore, subject to seizure and forfeiture to the United States pursuant to 18 U.S.C. § 981 and § 1955(d).

Signed under the pains and penalties of perjury this ___ day of March, 2005.

Philip M. Sliney, Jr.
Federal Bureau of Investigation

-19-

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1.  Title of case (name of first party on each side only) United States of America v. 1426-1428 Hyde Park
    Avenue, Hyde Park, Massachusetts, et al.,

2.  Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet.  (See local
    rule 40.1(a)(1)).

    ___    I.     160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

    ___    II.    195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730,      *Also complete AO 120 or AO 121
                  740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.          for patent, trademark or copyright cases

    ___    III.   110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
                  315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
                  380, 385, 450, 891.

    _X_    IV.    220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660,
                  690, 810, 861-865, 870, 871, 875, 900.

    ___    V.     150, 152, 153.

3.  Title and number, if any, of related cases.  (See local rule 40.1(g)).  If more than one prior related case has been filed in this
    district please indicate the title and number of the first filed case in this court.

    United States v. John J. Manning, CR No. 03-10031-WGY

4.  Has a prior action between the same parties and based on the same claim ever been filed in this court?

                                                      YES ☐      NO ☒

5.  Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?   (See 28
    USC §2403)

                                                      YES ☐      NO ☒

    If so, is the u.s.a. or an officer, agent or employee of the u.s. a party?

                                                      YES ☐      NO ☐

6.  Is this case required to be heard and determined by a district court of three judges pursuant to title 28 usc §2284?

                                                      YES ☐      NO ☒

7.  Do all of the parties in this action, excluding governmental agencies of the united states and the commonwealth of
    massachusetts ("governmental agencies"), residing in massachusetts reside in the same division? - (See local rule 40.1(d)).

    N/A                                               YES ☐      NO ☐

        A.     If yes, in which division do all of the non-governmental parties reside?

        Eastern Division ☐          Central Division ☐              Western Division ☐

        B.     If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental
               agencies, residing in Massachusetts reside?

        Eastern Division ☐          Central Division ☐              Western Division ☐

8.  If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court?  (If yes,
    submit a separate sheet identifying the motions)

    N/A                                               YES ☐      NO ☐

(PLEASE TYPE OR PRINT)

ATTORNEY'S NAME  Shelbey D. Wright, Assistant U.S. Attorney

ADDRESS  1 Courthouse Way, Suite 9200, Boston, MA  02210

TELEPHONE NO.  (617) 748-3100

(Cover sheet local.wpd - 09/12/02)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| United States of America v. | 1426-1428 Hyde Park Avenue, Hyde Park, Massachusetts, d/b/a "Manning Cafe Inc." and/or "Billy Jack's Restaurant"; $159,992.43 in U.S. Currency; and $210,000 in U.S. Currency |

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Shelbey D. Wright, Assistant U.S. Attorney
United States Attorney's Office
1 Courthouse Way, Suite 9200
Boston, MA  02210   (617) 748-3100

ATTORNEYS (IF KNOWN)

## II. BASIS OF JURISDICTION   (PLACE AN "X" IN ONE BOX ONLY)

XXX 1 U.S. Government Plaintiff

☐ 2 U.S. Government Defendant

☐ 3 Federal Question (U.S. Government Not a Party)

☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF
(For Diversity Cases Only)    AND ONE BOX FOR DEFENDANT)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN   (PLACE AN "X" IN ONE BOX ONLY)

XX Original Proceeding

☐ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from another district (specify)

☐ 6 Multidistrict Litigation

☐ 7 Appeal to District Judge from Magistrate Judgment

## V. NATURE OF SUIT   (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury — Med. Malpractice | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 423 Withdrawal 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 365 Personal Injury — Product Liability | ☐ 630 Liquor Laws | | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 830 Patent | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☒ 690 Other | ☐ 840 Trademark | ☐ 850 Securities/Commodities/Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **HABEAS CORPUS:** | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | ☐ 530 General | | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 871 IRS – Third Party 26 USC 7609 | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |

## VI. CAUSE OF ACTION   (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE.
DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

United States seeks forfeiture of the Defendant Properties pursuant to Title 18, United States Code, Section 1955(d), and Title 18, United States Code, Section 981.

## VII. REQUESTED IN COMPLAINT:

CHECK IF THIS IS A **CLASS ACTION**
☐ UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
**JURY DEMAND:**   ☐ YES   ☐ NO

## VIII. RELATED CASE(S) (See instructions):
IF ANY

JUDGE    YOUNG

DOCKET NUMBER    03-10031-WGY

DATE    3/10/05

SIGNATURE OF ATTORNEY OF RECORD
*Shelbey D. Wright*

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____